1
2
3
4
5
6                    **UNITED STATES DISTRICT COURT**
7                        **DISTRICT OF NEVADA**
8
9   BRAVO COMPANY USA, INC.,                )
                                            )
         Plaintiff,                         )
10                                          )        2:14-cv-00387-RCJ-GWF
         vs.                                )
11                                          )
    BADGER ORDNANCE LLC et al.,             )        **ORDER**
12                                          )
         Defendants.                        )
13  _____)

14         This case arises out of the alleged infringement of to of Defendants patents related to an

15  ambidextrous charging-handle for an M-16-type assault rifle.  Pending before the Court are

16  Defendants' Motion to Dismiss (ECF No. 12) for lack of personal jurisdiction and Plaintiff's

17  Motions for Leave to Conduct Jurisdictional Discovery and Extend Time to Respond (ECF Nos.

18  16, 17).  For the reasons given herein, the Court denies the motion to dismiss, without prejudice,

19  grants the motion for discovery in part, and denies the motion for an extension of time as moot.

20  **I.      FACTS AND PROCEDURAL HISTORY**

21         Plaintiff Bravo Company USA, Inc. ("Bravo Co.") manufactures an ambidextrous

22  charging handle for M-16-type[1] assault rifles called the "5.56mm/.223 Mod. A44 Black

23  _____

24         [1]Various versions of the M-16 .223 caliber (5.56 mm) rifle have been standard-issue in
    the U.S. Army since the 1960s.  Civilian versions of the rifle have also long been available.  The
25  charging handle is a standard part on all versions.  Whereas a traditional bolt-action rifle is

Ambidextrous Charging Handle GFH 556 MOD A44" (the "Accused Product") under a license

from non-party Abrams Airborne, Inc. d.b.a. Vltor Weapon Systems ("Vltor"). (Compl. ¶¶ 2–3,

Mar. 14, 2014, ECF No. 1). Vltor holds U.S. Patent No. 8,336,436 for an "Ambidextrous Cam

Style Charging Handle," pursuant to which Bravo Co. manufactures and sells the Accused

Product under license. (*Id.* ¶ 3). The '436 Patent is not directly at issue in the present case.

At issue are two patents owned by Defendant Badger Ordnance LLC ("Badger"), U.S.

Patents No. 7,900,546 and 7,240,600 (collectively, the "Patents"). (*See id.* ¶ 8). The '546 Patent

issued from a continuation of the application from which the '600 Patent issued. (*Id.* ¶ 5).

Defendant Martin J. Bordson is the sole inventor of the Patents, and he owns and controls

Badger. (*Id.* ¶¶ 5, 9). Badger has accused Bravo Co. of infringement of the Patents via the

manufacture and sale of the Accused Product, *inter alia*, in Nevada, and has threatened legal

action. (*Id.* ¶¶ 12–17). Bravo Co. has therefore filed the present suit for declarations of non-

---

cycled by the operator manipulating an extension of the bolt itself, the M-16, like other semi- or
fully-automatic rifles, is not so operated. "Charging" the weapon means cycling the first round
from the magazine into the empty chamber. To charge the weapon, the operator grasps the
charging handle, releases a latch on the charging handle permitting it to be pulled back, pulls it
back, and releases it. When the operator pulls the charging handle back, the forward edge of the
charging handle engages the bolt carrier group and pulls it backwards against the pressure of the
buffer spring. The bolt and the firing pin are contained within the bolt carrier group and move
with it. When the bolt carrier group has been pulled back far enough, the top cartridge in the
magazine is pushed upward by the spring in the bottom of the magazine (being no longer blocked
by the bolt carrier group), and the top edge of the cartridge protrudes slightly into the path of the
bolt at the front edge of the bolt carrier group. When the operator releases the charging handle,
the bolt carrier group springs violently forward, and the bolt catches the top edge of the cartridge,
pushing it forward out of the magazine and into the chamber. After the first round has been
fired, successive rounds cycle into the chamber automatically, as the previous process repeats
itself using the force of the expanding gas of the discharging previous cartridge. Traditional
charging handles can be grasped on the right and left sides, with the thumb and forefinger,
respectively, but there is a single latch on the left side of the charging handle, so that a right-
handed operator would typically use the right thumb to release the latch, whereas a left-handed
operator must use the left index finger. Presumably, an ambidextrous charging handle would
also provide a latch on the right side so that a left-handed operator could release the latch with
the left thumb rather than the left index finger.

1   infringement and invalidity.  Badger has moved to dismiss for lack of personal jurisdiction.

2   Bravo Co. has asked the Court for sixty days to conduct jurisdictional discovery and for twenty-

3   one days thereafter to oppose the motion to dismiss.

4   **II.   LEGAL STANDARDS**

5       A defendant may move to dismiss for lack of personal jurisdiction. *See* Fed. R. Civ. P.

6   12(b)(2).  Jurisdiction exists if: (1) provided for by law; and (2) the exercise of jurisdiction

7   comports with due process. *See Greenspun v. Del E. Webb Corp.*, 634 F.2d 1204, 1207 (9th Cir.

8   1980).  When no federal statute governs personal jurisdiction, a federal court applies the law of

9   the forum state. *See Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008).  Where a forum

10  state's long-arm statute provides its courts jurisdiction to the fullest extent of the Due Process

11  Clause of the Fourteenth Amendment, such as Nevada's does, *see Arbella Mut. Ins. Co. v. Eighth*

12  *Judicial Dist. Court*, 134 P.3d 710, 712 (Nev. 2006) (citing Nev. Rev. Stat. § 14.065), a court

13  need only apply federal due process standards, *see Boschetto*, 539 F.3d at 1015.[2]

14      There are two categories of personal jurisdiction: general jurisdiction and specific

15

16      [2]Nevada's long-arm rule restricts extra-territorial jurisdiction to the limits of both the U.S.
    and Nevada Constitutions. *See* Nev. Rev. Stat. § 14.065(1).  However, Nevada's due process
17  clause is textually identical to the federal clause in relevant respects, *see* Nev. Const. art. 1,
    § 8(5), and the Nevada Supreme Court reads the state clause as coextensive with the federal
18  clause, *see, e.g.*, *Wyman v. State*, 217 P.3d 572, 578 (Nev. 2009).  Until 1868, when the
    Fourteenth Amendment was adopted, the Due Process Clause of the Fifth Amendment did not
19  apply to the states. *See Barron v. City of Baltimore*, 32 U.S. 243, 250–51 (1833) (Marshall, C.J.).
    The Declaration of Rights that comprises Article I of the Nevada Constitution, which was
20  adopted in 1864, was included in order to impose certain restrictions on the State of Nevada that
    were already imposed against the federal government under the Bill of Rights, and the Nevada
21  Supreme Court has not interpreted the protections of the Declaration of Rights to exceed the
    scope of their federal counterparts. Michael W. Bowers, *The Sagebrush State* 43–44 (3rd ed.,
22  Univ. Nev. Press 2006); Michael W. Bowers, *The Nevada State Constitution* 24 (1993).  During
    the Nevada Constitutional Convention in 1864, the Due Process Clause of Article I was not
23  debated, although several other provisions of Article I, and even Section 8, were heavily debated.
    *See generally* Andrew J. Marsh, Official Report of the Debates and Proceedings of the
24  Constitutional Convention of the State of Nevada (Frank Eastman pr., 1866), *available at*
    http://books.google.com.
25

1    jurisdiction.  Traditionally, general jurisdiction exists over a defendant who has "substantial" or

2    "continuous and systematic" contacts with the forum state such that the assertion of personal

3    jurisdiction over her is constitutionally fair even where the claims are unrelated to those contacts.

4    *See Tuazon v. R.J. Reynolds Tobacco Co.*, 433 F.3d 1163, 1171 (9th Cir. 2006) (citing

5    *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415 (1984)).  A state court has

6    general jurisdiction over the state's own residents, for example.

7            The Supreme Court recently clarified that general personal jurisdiction exists only where

8    a company is at "home" in the forum state. *See Daimler AG v. Bauman*, 134 S. Ct. 746, 760–62

9    (2014).  The Court noted that "continuous and systematic" contacts alone are not enough in-and-

10   of-themselves to create general jurisdiction. *See id.*  The quoted phrase was in fact first used in

11   the context of *specific* jurisdiction as conjunctive with the "arises-out-of" requirement. *See id.* at

12   761 (citing *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326

13   U.S. 310, 317 (1945)).  "Accordingly, the inquiry under *Goodyear* is not whether a foreign

14   corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' it is

15   whether that corporation's 'affiliations with the State are so "continuous and systematic" as to

16   render [it] essentially at home in the forum State.'" *Id.* (quoting *Goodyear Dunlop Tires*

17   *Operations S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011)) (alteration in original).  So the company

18   must be at "home" in the forum state for there to be general jurisdiction.  Where this is not the

19   case, a plaintiff must rely on specific jurisdiction, i.e., the action must have arisen out of contacts

20   with the forum state.

21           Even where there is no general jurisdiction over a defendant, specific jurisdiction exists

22   when there are sufficient minimal contacts with the forum state such that the assertion of

23   personal jurisdiction "does not offend 'traditional notions of fair play and substantial justice.'"

24   *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316

25   (1945) (quoting *Milliken*, 311 U.S. at 463).  The standard has been restated using different

verbiage. *See Hanson v. Denckla*, 357 U.S. 235, 253 (1958) ("[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." (citing *Int'l Shoe Co.*, 326 U.S. at 319)); *World-wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980) ("[T]he foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." (citing *Kulko v. Superior Court of Cal.*, 436 U.S. 84, 97–98 (1978))). From these cases and others, the Ninth Circuit has developed a three-part test for specific jurisdiction:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Boschetto*, 539 F.3d at 1016 (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)).

> The plaintiff bears the burden on the first two prongs. If the plaintiff establishes both prongs one and two, the defendant must come forward with a "compelling case" that the exercise of jurisdiction would not be reasonable. But if the plaintiff fails at the first step, the jurisdictional inquiry ends and the case must be dismissed.

*Id.* (citations omitted). The "purposeful direction" option of the first prong uses the "*Calder*-effects" test, under which "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010) (quoting *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433

F.3d 1199, 1206 (9th Cir.2006) (en banc)).  The third prong is a seven-factor balancing test,

under which a court considers:

> (1) the extent of the defendant's purposeful interjection into the forum state's
> affairs; (2) the burden on the defendant of defending in the forum; (3) the extent
> of conflict with the sovereignty of the defendants' state; (4) the forum state's
> interest in adjudicating the dispute; (5) the most efficient judicial resolution of the
> controversy; (6) the importance of the forum to the plaintiff's interest in
> convenient and effective relief; and (7) the existence of an alternative forum.

*Menken v. Emm*, 503 F.3d 1050, 1060 (9th Cir. 2007) (quoting *CE Distrib., LLC v. New Sensor
Corp.*, 380 F.3d 107, 1112 (9th Cir. 2004)).

## III.   ANALYSIS

There is no general personal jurisdiction over Badger in Nevada.  Bravo Co. alleges that

Badger is a Missouri limited liability company with its principle place of business (and

presumably its headquarters) in Kansas City, Missouri and does not allege that any of Badger's

members are Nevada citizens or that its headquarters is in Nevada. (*See* Compl. ¶ 7).  Bordson's

citizenship is not alleged, but he is alleges to own and control Badger, so he presumably resides

in Missouri or Kansas. (*See generally id.*).  There is therefore no basis to find that Badger is "at

home" in Nevada. *See Daimler AG v. Bauman*, 134 S. Ct. 746, 760–62 (2014).[3]  Plaintiff ignores

*Daimler AG* and argues under the previous "systematic contacts" test.

There may still be specific personal jurisdiction over Badger in Nevada if this action

arises out of minimal contacts of Badger with the State.  In declaratory judgment actions for non-

infringement and/or invalidity, courts typically find no specific personal jurisdiction over

patentee defendants where the defendant's only contact with the forum is the sending of a cease-

and-desist letter. *See* 8 Donald S. Chisum, *Chisum on Patents* § 21.02[3][a][ii], at 21-239 & n.67

(Matthew Bender & Co. 2013) (collecting cases).  On the other hand, courts tend to find specific

personal jurisdiction where such defendants have additional contacts with the forum, such as the

[3]

1   regular shipment of goods covered by the patent into the forum. *See id.* at 21-239 to 21-243 &
2   n.68 (collecting cases).

3        The Federal Circuit appears to have most recently ruled in a patentee-defendant personal
4   jurisdiction case in 2011. *See Radio Sys. Corp. v. Accession, Inc.*, 638 F.3d 785, (Fed. Cir. 2011).
5   The court began by noting that "ordinary cease-and-desist notices sent by a patentee to an alleged
6   infringing party in a different state are not sufficient to subject the patentee to specific
7   jurisdiction in that state," *id.* at 789 (citing *Red Wing Shoe Co. v. Hockerson–Halberstadt, Inc.*,
8   148 F.3d 1355 (Fed. Cir. 1998)), but that "certain other patent enforcement actions, taken in
9   conjunction with the issuance of cease-and-desist letters, are sufficient to support specific
10  jurisdiction over a patentee in a foreign forum," *id.* (citing *Autogenomics, Inc. v. Oxford Gene*
11  *Tech. Ltd.*, 566 F.3d 1012, 1019 (Fed. Cir. 2009) (collecting cases)).  For the purposes of a
12  personal jurisdiction analysis, a declaratory judgment action for non-infringement "arises out of"
13  the activities of the patentee in enforcing the patent(s) at issue, and the relevant inquiry is
14  therefore "to what extent . . . the defendant patentee purposefully directed such enforcement
15  activities at residents of the forum and the extent to which the declaratory judgment claim arises
16  out of or relates to those activities." *Id.* (quoting *Avocent Huntsville Corp. v. Aten Intern. Co.,*
17  *Ltd.*, 552 F.3d 1324, 1332 (Fed. Cir. 2008)).  "Thus, only those activities of the patentee that
18  relate to the enforcement or defense of the patent can give rise to specific personal jurisdiction
19  for such an action." *Id.* (citing *Avocent Huntsville Corp.*, 552 F.3d at 1336; *Autogenomics*, 566
20  F.3d at 1020).

21       Defendants are correct that the single cease-and-desist letter sent by Defendants from
22  Nevada to Plaintiff's Wisconsin headquarters on January 10, 2013 (the "Letter") is insufficient to
23  establish specific personal jurisdiction in Nevada. *See id.* at 789.[4]  Defendants are also correct

24  _____

25      [4]The Letter identified by Defendants is presumably the contact alleged in paragraph 15 of
the Complaint.

1   that their contacts with Nevada alleged in paragraphs 12, 13, 14, and 16 of the Complaint are

2   irrelevant to the personal jurisdiction question in the present non-infringement action, because

3   those allegations have to do with Defendants' business activities in the state unrelated to the

4   enforcement of the Patents. *See id.*

5        In response, Plaintiff argues that in addition to the Letter, Badger retained Nevada-based

6   counsel as its agent for enforcement of the Patents and that Bordson twice attempted to contact

7   Plaintiff about a license agreement.  The Court finds these contacts to be insufficient, and at least

8   two of the three do not represent contacts with Nevada at all.  Bordson attests that he attempted

9   to call Plaintiff at its 1-800-number to discuss a potential license agreement and that he later sent

10   an email to Plaintiff for the same purpose. (*See* Bordson Decl. ¶¶ 7–8, Apr. 23, 2014, ECF No.

11   12-1).  The phone call went unanswered, and a response to the email directed Bordson to another

12   company. (*See id.*).  More importantly, the communications were not directed to Nevada, but to

13   Wisconsin.  Next, Bennet K. Langlotz attests that he has lived in Texas since November 2013,

14   that he used a P.O. box in Genoa, Nevada for his patent practice until 2009, but since then he has

15   used a District of Columbia P.O. box. (*See* Langlotz Decl. ¶¶ 1–6, Apr. 23, 2014, ECF No. 12-2).

16   Langlotz prosecuted the Patents at issue before the U.S. Patent and Trademark Office beginning

17   in 2004. (*Id.* ¶ 7).  On January 10, 2013, while still living in Nevada, he sent a cease-and-desist

18   letter to Plaintiff's headquarters in Hartland, Wisconsin. (*Id.* ¶ 9–10).  The Letter is attached.  it is

19   a cease-and-desist letter with an offer to negotiate a license.  On February 27, 2014, Langlotz sent

20   a similar letter from his new residence in Texas to Plaintiff in Wisconsin indicating Plaintiff's

21   need to acquire a license. (*Id.* ¶ 11).  No license negotiations occurred in Nevada or elsewhere.

22   (*See id.* ¶¶ 12–13).  Langlotz cannot recall any other communications sent to Plaintiff before it

23   filed the present lawsuit. (*See id.* ¶ 13).  Neither letter supports personal jurisdiction in Nevada,

24   because neither was sent to Nevada.  The first letter was sent from Nevada, but it is a cease-and-

25   desist letter including an offer to negotiate a license.  An offer to negotiate a license to avoid

1  litigation is common fare for such letters and does not support personal jurisdiction even if

2  directed to the forum state, which is not the case here.  And a letter sent from a patentee's agent

3  from a given forum is simply not directed to that forum.

4        The Court will permit limited jurisdictional discovery.  Plaintiff may have thirty (30) days

5  to send interrogatories to Bordson concerning the limited questions of whether and in what ways

6  Bordson or his agents have negotiated or entered into licenses to the Patents in Nevada or sued

7  others in Nevada regarding the Patents, may request the production of related documents, and

8  may depose Bordson for no more than four (4) hours as to those topics at a place convenient to

9  Bordson.

10        The Court will not permit Plaintiff to conduct discovery for the purpose of obtaining

11  information concerning the ownership rights of the Patents.  Plaintiff implies that some other

12  party may in fact own the Patents—it simply is not certain.  But no potential non-infringement

13  action could yet be ripe as to a putative defendant Plaintiff does not even know of, because any

14  person who has contacted Plaintiff to allege infringement (the requirement for ripeness in such an

15  action) would already be known to Plaintiff.  Defendants note that Bordson owns the Patents.

16  That is why there is no record of assignment.  Badger is a fictitious name for Bordson's sole

17  proprietorship.  It is not in fact a limited liability company, and the Missouri Secretary of State's

18  website identifies Bordson as the sole owner of Badger.

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

1

**CONCLUSION**

2          IT IS HEREBY ORDERED that the Motion to Dismiss (ECF No. 12) is DENIED,

3    without prejudice.

4          IT IS FURTHER ORDERED that the Motion for Leave to Conduct Jurisdictional

5    Discovery (ECF No. 16) is GRANTED IN PART.  Plaintiff may conduct jurisdictional discovery

6    as delineated, *supra*, for thirty (30) days from the date this Order is entered into the electronic

7    docket.

8          IT IS FURTHER ORDERED that the Motion for Extend Time to Respond (ECF No. 17)

9    is DENIED as moot.  Defendants may renew their motion after the close of jurisdictional

10   discovery, and Plaintiff may respond in the regular course.

11         IT IS SO ORDERED.

12   Dated this 16th day of June, 2014.

13

14   _____
              ROBERT C. JONES
15           United States District Judge

16

17

18

19

20

21

22

23

24

25