UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| BRAVO COMPANY USA, INC.,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>BADGER ORDNANCE LLC et al.,<br><br>　　　　Defendants. | 2:14-cv-00387-RCJ-GWF<br><br>**ORDER** |

This case arises out of the alleged infringement of two of Defendants' patents related to an ambidextrous charging handle for an M-16-type assault rifle. Pending before the Court is a stipulation as to claim construction.

## I.   FACTS AND PROCEDURAL HISTORY

Plaintiff Bravo Company USA, Inc. ("Bravo") manufactures an ambidextrous charging handle[1] for M-16-type assault rifles called the "5.56mm/.223 Mod. A44 Black Ambidextrous

---

[1] Various versions of the M-16 .223 caliber (5.56 mm) rifle have been standard-issue in the U.S. Army since the 1960s. Civilian versions of the rifle have also long been available. The charging handle is a standard part on all versions. Whereas a traditional bolt-action rifle is cycled by the operator manipulating an extension of the bolt itself, the M-16, like many other semi- or fully-automatic rifles, is not so operated. "Charging" the weapon means moving the first cartridge from the magazine into the chamber. To charge the weapon, the operator grasps the charging handle, releases a latch on the charging handle permitting the charging handle to be pulled back, pulls the charging handle back, and releases it. When the operator pulls the charging handle back, the forward edge of the charging handle catches the bolt carrier group and pulls it

1  Charging Handle GFH 556 MOD A44" (the "Accused Product") under a license from non-party

2  Abrams Airborne, Inc. d.b.a. Vltor Weapon Systems ("Vltor"). (Compl. ¶¶ 2–3, ECF No. 1).

3  Vltor holds U.S. Patent No. 8,336,436 for an "Ambidextrous Cam Style Charging Handle,"

4  pursuant to which Bravo Co. manufactures and sells the Accused Product under license. (*Id.* ¶ 3).

   The '436 Patent is not directly at issue in the present case.  At issue are two patents

6  owned by Defendant Badger Ordnance LLC ("Badger"), U.S. Patent Nos. 7,900,546 and

7  7,240,600 (collectively, the "Patents").  (*See id.* ¶ 8).  The '546 Patent issued from a continuation

8  of the application from which the '600 Patent issued. (*Id.* ¶ 5).  Defendant Martin J. Bordson is

9  the sole inventor of the Patents, and he owns and controls Badger. (*Id.* ¶¶ 5, 9).  Badger accused

10 Bravo Co. of infringement of the Patents via the manufacture and sale of the Accused Product,

11 *inter alia*, in Nevada, and has threatened legal action. (*Id.* ¶¶ 12–17).  Bravo Co. therefore filed

12 the present suit for declarations of non-infringement and invalidity.  The First Amended

13 Complaint includes claims for declaratory judgment of non-infringement and invalidity of the

14 Patents.  Badger filed a Counterclaim for infringement of the Patents.

---

backwards against the pressure of the buffer spring.  The bolt and the firing pin are contained within the bolt carrier group and move with it.  When the bolt carrier group has been pulled back far enough, the top cartridge in the magazine is pushed upward by the spring in the bottom of the magazine (being no longer blocked by the bolt carrier group) such that the top edge of the cartridge protrudes into the path of the bolt at the front edge of the bolt carrier group.  When the operator releases the charging handle, the bolt carrier group springs violently forward, and the bolt catches the top edge of the cartridge, pushing it forward out of the magazine and into the chamber.  After the first round has been fired, successive rounds cycle into the chamber automatically, as the previous process repeats itself using the force of the expanding gas of the discharging previous cartridge.  Traditional charging handles can be grasped on the left and right sides, but there is a single latch on the left side of the charging handle, so that a right-handed operator would typically use the right thumb to release the latch, whereas a left-handed operator would typically use the left index finger, which is less comfortable.  Presumably, an ambidextrous charging handle would also provide a latch on the right side so that a left-handed operator could release the latch with the left thumb.

Badger moved to dismiss for lack of personal jurisdiction. The Court denied the motion, granted jurisdictional discovery, and denied a renewed motion. The parties filed *Markman* briefs. While the briefs were pending, the parties stipulated to dismiss all claims concerning the '600 Patent. The parties have further stipulated as to construction of most of the previously disputed claim terms of the '546 Patent.

## II. CLAIM CONSTRUCTION STANDARDS

The construction of terms found in patent claims is a question of law to be determined by the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "[T]he interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)). Consequently, courts construe claims in the manner that "most naturally aligns with the patent's description of the invention." *Id.*

The first step in claim construction is to look to the language of the claims themselves. "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). A disputed claim term should be construed in light of its "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* In some cases, the ordinary meaning of a disputed term to a person of skill in the art is readily apparent, and claim construction involves "little more than the application of the widely accepted meaning

of commonly understood words." *Id.* at 1314. Moreover, a district court is not obligated to construe terms with ordinary meanings, lest trial courts be inundated with requests to parse the meaning of every word in the asserted claims. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008); *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (noting that claim construction "is not an obligatory exercise in redundancy"); *see also Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001) (finding no error in the non-construction of the word "melting"); *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1380 (Fed. Cir. 2001) (finding no error in the lower court's refusal to construe "irrigating" and "frictional heat").

Claim construction may deviate from the ordinary and customary meaning of a disputed term only if: (1) "a patentee sets out a definition and acts as his own lexicographer"; or (2) "the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Ordinary and customary meaning is not always the same as the dictionary definition. *Phillips*, 415 F.3d at 1321.

> Properly viewed, the "ordinary meaning" of a claim term is its meaning to the ordinary artisan after reading the entire patent. Yet heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification.

*Id.* "Thus, the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). It is therefore "entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of claims." *Phillips*, 415 F.3d at 1315. Courts can

also look to the prosecution history as part of the intrinsic record to determine how the Patent Office and the inventor understood the patent. *Id.* at 1317. However, the prosecution history lacks the clarity of the specification and is often less useful for claim construction purposes. *Id.*

Finally, "[a] court may, in its discretion, receive extrinsic evidence in order to aid the court in coming to a correct conclusion as to the true meaning of the language employed in the patent." *Markman*, 52 F.3d at 980 (internal citations and quotation marks omitted). Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* Although such evidence may aid the court in construing claim terms, "it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319. Thus, "while extrinsic evidence can shed useful light on the relevant art, . . . it is less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* at 1317 (internal quotation marks omitted).

### III.   ANALYSIS

Although there appears to be no case law on the issue, it gives the Court pause to permit stipulated claim constructions, because that essentially permits the parties to stipulate to the law, which is generally not permitted. *See Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1477 & n.1 (9th Cir. 1986). Claim construction is a determination of the law because the scope of a patent claim defines the patentee's right to exclude and, by implication, the public's right to practice similar art, and a construction of disputed terms thereby delineates the contours of causes of action for infringement and invalidity. That's why the Supreme Court requires judges to construe disputed claims as a matter of law, and to so instruct juries, rather than submit claim

1 construction disputes to juries as a factual questions antecedent to questions of infringement or

2 invalidity. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384–91 (1996).

3     On the other hand, the parties to such a stipulation will thereby waive any appeal as to

4 claim construction, so reversal on the issue seems unlikely.  Also, nonparties will not be bound

5 in other cases.  Moreover, the stipulated constructions in this case are nearly identical to the

6 Court's own opinion of the correct constructions in light of the parties' previous dispute.

7 ///

8 ///

9 ///

10 ///

11 ///

12 ///

13 ///

14 ///

15 ///

16 ///

17 ///

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24

**CONCLUSION**

IT IS HEREBY ORDERED that the Stipulation (ECF No. 95) is GRANTED IN PART and the disputed terms are construed as follows:

1. "[first/second] latch element[s]" - "first latch" and "second latch"
2. "spring biased in opposite rotational directions" - "pressed by spring(s) in opposite directions of rotation, such as clockwise and counterclockwise"
3. "pivot pin" and "pivotally connected" - no need of further construction
4. "latch engaging element" - no need of further construction
5. "operable to reciprocate" - term is not limiting on any claim
6. "protrusion" - no need of further construction

The terms "operable to engage" and "operably engaged to each other" remain to be construed at the *Markman* hearing.

IT IS FURTHER ORDERED that this Order does not constitute a finding and is only binding as to the parties in this case.

IT IS SO ORDERED.

Dated this 17th day of May, 2016.

_____
ROBERT C. JONES
United States District Judge