**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

BRAVO COMPANY USA, INC.,

Plaintiff,

vs.

BADGER ORDNANCE LLC et al.,

Defendants.

2:14-cv-00387-RCJ-GWF

**ORDER**

This case arises out of the alleged infringement of two of Defendants' patents related to an ambidextrous charging handle for an M-16-type assault rifle. Pending before the Court are the parties' claim construction ("*Markman*") briefs.

**I. FACTS AND PROCEDURAL HISTORY**

Plaintiff Bravo Company USA, Inc. ("Bravo") manufactures an ambidextrous charging handle[1] for M-16-type assault rifles called the "5.56mm/.223 Mod. A44 Black Ambidextrous

1 Various versions of the M-16 .223 caliber (5.56 mm) rifle have been standard-issue in the U.S. Army since the 1960s. Civilian versions of the rifle have also long been available. The charging handle is a standard part on all versions. Whereas a traditional bolt-action rifle is cycled by the operator manipulating an extension of the bolt itself, the M-16, like many other semi- or fully-automatic rifles, is not so operated. "Charging" the weapon means moving the first cartridge from the magazine into the chamber. To charge the weapon, the operator grasps the charging handle, releases a latch on the charging handle permitting the charging handle to be pulled back, pulls the charging handle back, and releases it. When the operator pulls the charging handle back, the forward edge of the charging handle catches the bolt carrier group and pulls it

Charging Handle GFH 556 MOD A44" (the "Accused Product") under a license from non-party Abrams Airborne, Inc. d.b.a. Vltor Weapon Systems ("Vltor"). (Compl. ¶¶ 2–3, ECF No. 1). Vltor holds U.S. Patent No. 8,336,436 for an "Ambidextrous Cam Style Charging Handle," pursuant to which Bravo Co. manufactures and sells the Accused Product under license. (*Id.* ¶ 3).

The '436 Patent is not directly at issue in the present case. At issue are two patents owned by Defendant Badger Ordnance LLC ("Badger"), U.S. Patent Nos. 7,900,546 and 7,240,600 (collectively, the "Patents"). (*See id.* ¶ 8). The '546 Patent issued from a continuation of the application from which the '600 Patent issued. (*Id.* ¶ 5). Defendant Martin J. Bordson is the sole inventor of the Patents, and he owns and controls Badger. (*Id.* ¶¶ 5, 9). Badger accused Bravo Co. of infringement of the Patents via the manufacture and sale of the Accused Product, *inter alia*, in Nevada, and has threatened legal action. (*Id.* ¶¶ 12–17). Bravo Co. therefore filed the present suit for declarations of non-infringement and invalidity. The First Amended Complaint includes claims for declaratory judgment of non-infringement and invalidity of the Patents. Badger filed a Counterclaim for infringement of the Patents.

---

backwards against the pressure of the buffer spring. The bolt and the firing pin are contained within the bolt carrier group and move with it. When the bolt carrier group has been pulled back far enough, the top cartridge in the magazine is pushed upward by the spring in the bottom of the magazine (being no longer blocked by the bolt carrier group) such that the top edge of the cartridge protrudes into the path of the bolt at the front edge of the bolt carrier group. When the operator releases the charging handle, the bolt carrier group springs violently forward, and the bolt catches the top edge of the cartridge, pushing it forward out of the magazine and into the chamber. After the first round has been fired, successive rounds cycle into the chamber automatically, as the previous process repeats itself using the force of the expanding gas of the discharging previous cartridge. Traditional charging handles can be grasped on the left and right sides, but there is a single latch on the left side of the charging handle, so that a right-handed operator would typically use the right thumb to release the latch, whereas a left-handed operator would typically use the left index finger, which is less comfortable. Presumably, an ambidextrous charging handle would also provide a latch on the right side so that a left-handed operator could release the latch with the left thumb.

Badger moved to dismiss for lack of personal jurisdiction. The Court denied the motion, granted jurisdictional discovery, and denied a renewed motion. The parties filed *Markman* briefs and have since stipulated to dismissal of the claims relating to the '600 Patent and have further stipulated to the construction of all claim terms relating to the '546 Patent except "operable to engage" and "operably engaged to each other."

## II. CLAIM CONSTRUCTION STANDARDS

The construction of terms found in patent claims is a question of law to be determined by the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "[T]he interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998)). Consequently, courts construe claims in the manner that "most naturally aligns with the patent's description of the invention." *Id.*

The first step in claim construction is to look to the language of the claims themselves. "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). A disputed claim term should be construed in light of its "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* In some cases, the ordinary meaning of a disputed term to a person of skill in the art is readily apparent, and claim construction involves "little more than the application of the widely accepted meaning

of commonly understood words." *Id.* at 1314. Moreover, a district court is not obligated to construe terms with ordinary meanings, lest trial courts be inundated with requests to parse the meaning of every word in the asserted claims. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008); *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (noting that claim construction "is not an obligatory exercise in redundancy"); *see also Biotec Biologische Naturverpackungen GmbH & Co. KG v. Biocorp, Inc.*, 249 F.3d 1341, 1349 (Fed. Cir. 2001) (finding no error in the non-construction of the word "melting"); *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1380 (Fed. Cir. 2001) (finding no error in the lower court's refusal to construe "irrigating" and "frictional heat").

Claim construction may deviate from the ordinary and customary meaning of a disputed term only if: (1) "a patentee sets out a definition and acts as his own lexicographer"; or (2) "the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). Ordinary and customary meaning is not always the same as the dictionary definition. *Phillips*, 415 F.3d at 1321.

> Properly viewed, the "ordinary meaning" of a claim term is its meaning to the ordinary artisan after reading the entire patent. Yet heavy reliance on the dictionary divorced from the intrinsic evidence risks transforming the meaning of the claim term to the artisan into the meaning of the term in the abstract, out of its particular context, which is the specification.

*Id.* "Thus, the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). It is therefore "entirely appropriate for a court, when conducting claim construction, to rely heavily on the written description for guidance as to the meaning of claims." *Phillips*, 415 F.3d at 1315. Courts can

also look to the prosecution history as part of the intrinsic record to determine how the Patent Office and the inventor understood the patent. *Id.* at 1317. However, the prosecution history lacks the clarity of the specification and is often less useful for claim construction purposes. *Id.*

Finally, "[a] court may, in its discretion, receive extrinsic evidence in order to aid the court in coming to a correct conclusion as to the true meaning of the language employed in the patent." *Markman*, 52 F.3d at 980 (internal citations and quotation marks omitted). Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* Although such evidence may aid the court in construing claim terms, "it is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319. Thus, "while extrinsic evidence can shed useful light on the relevant art, . . . it is less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* at 1317 (internal quotation marks omitted).

**III. ANALYSIS**

Bravo argues that "operable to engage" and "operably engaged to each other" should be respectively construed to mean "capable of interlocking" and "interlocked with each other." Bordson argues that the terms should be construed according to their ordinary and customary meaning, which is in the claim language itself. The '546 Patent includes no form of the word "interlock" in the claims or the specifications, and the Court will not import the word "interlock" into the claims. And there is little utility in substituting "capable" for "operable" or "of engaging" for "to engage." There is no confusion as to the terms read in light of the entire Patent, and the Court finds that the terms are not in need of further construction. Moreover, Claim 16, which depends from Claim 11, adds the limitation "wherein the first and second latch

element are pivotally interlinked by the engagement of the protrusion and the recess." This indicates (indeed, necessitates) that Claim 11 is not so limited. The Court will not import the word "interlocked" into Claim 11.

**CONCLUSION**

IT IS HEREBY ORDERED that the disputed terms are construed as follows:

1. "operable to engage" - no need of further construction

2. "operably engaged to each other" - no need of further construction

IT IS SO ORDERED.

Dated this 7th day of September, 2016.

ROBERT C. JONES
United States District Judge